## THOMPSON *v.* MANKIN.

CONSTITUTIONAL LAW.—A State government not in the United States and in obedience to her Constitution, is not, as a law making power, a part of the United States government, and there is no law, State or National, by which that government, when she conquers her opposers, is bound to recognize as valid the public or political action of any such State while engaged in rebellion against the national Constitution and laws.

If the lawful government of the United States, or of a State, through the proper political departments, do not recognize the validity of the acts of such rebel State, the courts of the regular State government have no authority to hold the public acts and proceedings of a State, so in opposition to the Constitution and laws of the United States, valid and binding between individuals.

The force and effect of all acts of the courts of a State in rebellion depends upon the recognition of the conquering power.

The recognition of the civil government must be decided by the political department of the government to which the courts belong, and when so decided, are to be considered *res adjudicata.*

The government recognized by the President of the United States, whether foreign or domestic, is the one acknowledged by the courts.

The governments, established by the States in rebellion, were never recognized by the government of the United States as the legal State governments.

The according of belligerent rights, to a State in rebellion, does not constitute a government *de facto.*

CONFEDERATE COURTS—*Service by, not binding.*—Service made, during the rebellion, by a Confederate Court is not binding upon the party to appear, and any decree or judgment rendered thereon is a nullity.

*Error to Arkansas Circuit Court.*

HON. WILLIAM M. HARRISON, Circuit Judge.

*Clark, Williams & Martin,*for appellant.

*Bell & Carlton,* for appellee.

GREGG, J.

In this case it appears that Joseph Maxwell, as clerk of Arkansas circuit court, on the 17th day of August, 1861, issued a writ of summons against the plaintiff in error, which, on the 3d of October following, was read to him by Henry Stephens, as sheriff, and it required him to appear at the circuit court of said county in November, 1861, to answer the complaint of said Mankin. Then follows an opening order of the circuit court of said county, on the 13th of October, 1865, and a judgment against Thompson by default.

The only question presented, is, whether or not Thompson, upon these proceedings, was compelled to appear in the circuit court of that county in October, 1865, and answer at the suit of Mankin. But this, as did the case of *Penn v. Tollison,* involves the regularity and validity of proceedings had in the fall of 1861. Counsel submit, if they were valid, the judgment is good, otherwise, it is reversable for want of service.

Since the suppression of the rebellion much has been said, and some very elaborate and learned opinions have been written upon the statutes of this State during the insurrection. After much delay and anxious consideration, I cannot consent to some of those very ably written arguments and opinions. Courts take judicial notice of important facts in the history of a State, and thus we know that on the 6th of May, 1861, a Convention, of the delegates of the people of this State, passed an ordinance of secession and attempted to withdraw the State from the Federal Union, and to sever her citizens from all allegiance to the government; and thereafter formed an alliance

with certain other States, then in rebellion, against the government, and with them, by armed force, resisted the authority of that government until 1865, overcome by superior power, they were compelled to submit to her mandates.   This we also know by the public acts of Congress and proclamations of the President, as well as by the acts of our State Convention and legislature.   By the act of Congress of July 13th, and the proclamation of the President of August 16, 1861, this, among other States, was declared in rebellion against the United States government, and that the laws thereof could not be enforced within our limits; other acts of Congress, and proclamations show the continuance of the rebellion, and when it ceased; so that we must know that the acts of Maxwell and Stephens, above referred to, were within the rebellion, and had such power and force only as the rebellious authority could give them.

It has been urged that when resistance to lawful authority has been made, by a sufficient number and such means, that those, engaged in re-establishing order, must recognize the insurgents as enemies at war ; must accord to them belligerent rights, when subdued; all their acts, not directly in aid of war with the proper government, must be regarded as valid and binding ; in other words, that a rebellion of such magnitude as to be considered a civil war, gives to those, engaged in such rebellion, all the civil power and authority of a regular, valid, recognized government during the existence of the insurrection, and that the civil acts of such rebellious authority must be taken and considered settled law by the courts of the legitimate government.   This we are not prepared to concede. The magnitude of the resistance, the force of numbers, may require belligerent rights, but these are war rights—they are rights existing for the sake of humanity, and to soften the rigors of war, which are always harsh enough, and not to settle individual titles to property.

When war exists, the belligerents may capture or destroy the property of each other, and each, if not right, by power

may enforce laws, or rules, as to property, as well as persons, within their own lines of occupation; but such laws, or rules, are considered nowhere binding upon the opposing army, and if the citizens are brought within the lines of the opposing forces, there is no power or law, by which they can demand of the advancing army to observe the laws laid down by the receding forces, and it is wholly at their option whether or not they will regard the laws or rules enforced by the former army; and we are of opinion that any civil organizations, rules or forms of government, adopted by those supporting the rebel cause, within its lines, and protected by its power, though adopted in the form of civil law, must depend upon a like principle—must depend upon recognition and assent.

We are not aware of any principle, in international law, that compels a conquering power to observe all the property rights in the conquered territory. Wisdom and natural justice may dictate such a policy; yet we hold that there may be a marked difference between true policy and absolute rights, and even in policy there may be a difference; there may be a respect due the laws and customs of an established and recognized government among civilized powers, even when such government is conquered, and destined to be forever extinct, that cannot be claimed for the enactments of mere combinations of persons or communities in opposition to their government, and without authority recognized by it, or by other existing governments. If an individual acquires a property right under the laws and regulations of a properly organized and existing government, a government known and recognized as one among the nations of the earth, he can, with great force and reason, insist that such right be respected by any succeeding power that may acquire dominion over him, and to divest such rights might well be considered a harsh use of conquering power, rather than an observance of those rules of natural justice prevailing among civilized nations; but if a member of a lawless mob, overruning a small district of country, when dispersed and driven to obedience by legitimate authority, sets

up a claim to property, by a right under the rules or laws of the insurrectionary party, it would not be recognized by any one. And so, in all cases, the demand for the protection of such alleged property rights is more or less just in proportion as the power, that attempted to confer such right, was or was not proper governmental authority; and these conditions, which are addressed mainly to the political departments of the established government, should certainly have a controlling influence over it; and we maintain that the recognition of a civil government, so far as the courts are concerned, must be decided by the political departments of that government to which the courts belong; and when so determined, the question is *res adjudicata* with her courts, and taking the question thus settled, they must determine rights of litigants by the rules of law applicable in such cases.

In the case of *Sutton vs. Bordan,* the Supreme Court of the United States said: " That it rested with the political power to decide whether the charter government had been displaced or not, and when that decision was made, the judicial department would be bound to take notice of it as the permanent law of the state, without the aid of oral evidence, or the examination of witnesses; that, according to the laws and institutions of Rhode Island, no such change had been recognized by the political power, and that the charter government was the lawful and established government of the State, during the period in contest, and that those who were in arms against it were insurgents, and were liable to punishment. * * *

"In the case of foreign nations, the government acknowledged by the President is always recognized in the courts of justice; and this principle has been applied, by the Act of Congress, to the sovereign States of the Union. * * * * *

"No one, we believe, has ever doubted the proposition that, according to the institutions of this country, the sovereignty in every State resides in the people of the State, and that they may alter and change their form of government at their own pleasure. But whether they have changed it or not, by abol-

ishing an old government and establishing a new one in its place, is a question to be settled by the political power, and when that power has decided, the courts are bound to take notice of its decisions and to follow it."

According to the doctrine announced in these extracts, can this court recognize the acts of any power, claiming to be a government, as valid, if the political departments of our government declare that no valid government did then and there exist?

The Supreme Court of Tennessee, in the case of *Wright & Cantrell v. Overall*, after urging that the court has no power to recognize a government not acknowledged by the political departments, say: "No rights or protection can accrue to individuals under Confederate laws; they were enacted without lawful authority and against the policy, laws and Constitution of the United States, and the courts of the country are bound to treat them as if they never had been promulgated; *2 Cold.*, *344*." The same court, in case of *Thornburg v. Harris, 8 Cold., 168*, say: "The according of belligerent rights to the insurgents, did not constitute them a government *de facto*, nor vest in them any of the rights of sovereignty which would authorize them to issue a currency that can be recognized, as legal, by the courts sitting under the authority of the regular government, nor can the courts recognize any of the acts of the insurgents in their organization as a civil government. The question rests with the political power of the government; so long as that power withholds its recognition, the courts of the country cannot lend their aid to enforce any contract growing out of the organization of the so-called Confederate States."

In the case of *Ray v. Thompson, 43 Ala., 454*, the Supreme Court of that State say: "It is known to the court, as a part of the judicial history of the State, that the court, in which this judgment was rendered, constituted a portion of one of the departments of a government established in hostility to the Constitution of the United States. It has been settled that the acts of the legislature of such a government are invalid.

\* \* \* If this is admitted, and it seems it cannot be denied, it cannot well be considered, how the judgments of the courts of such a government can be better or more valid than its laws."

And in this discussion we must not lose sight of the fact, that writers upon international law, in commenting upon the rights of communities or individuals, as they should be respected by a conquering government, address themselves to the military and political departments of that government, and declare what is the duty of the government, and not what is the authority and power of the courts belonging to the government. They cannot, and do not attempt to lay down any arbitrary rules, as law, by which the courts must be governed, without regard to what the political departments announce as the fundamental law of the State. The rights of citizens depend upon the sovereign will of the States, and not upon any rule of courts to be adopted contrary to such will, and those outside of a government, who are brought under that government by the conquering power of arms, come in with *no vested* rights, except such as have been recognized by the conquering power, or secured by treaty, or which may afterwards be conceded to them by those in authority.

Nor must we lose sight of the difference between what a sovereign ought to do, and usually does do, and what he has the power to do, when by the powers of war he subdues his enemies. Does any one doubt that in case of a civil war, when the insurgents are compelled to submit, that the government, although their numbers might be considerable, might not declare them traitors and subject to punishment as such? Had Great Britian seen fit to execute all the conquered Fenians, she might have incurred the censure of civilized people, but would any one here question her national right to do so? How many said Maxamillian's life and property should not be forfeited to Mexico, yet who denied her lawful power to kill him, or appealed from her decision when she did so? And upon an unconditional surrender of a rebellion, can any one question the power of the government to confiscate a part or the whole

of the insurgents' property, or impose other restrictions or limitations upon them ? In a republican government we may condemn such policy, but the propriety of doing and the power to do are different ; and we are trying to demonstrate what is a right of war or governmental power in such case, and to direct the minds of counsel and parties to the distinction between what a government may do and ought to do, and what the courts of such government have authority to do.

While the political departments, the sovereignty of a nation, have a large discretion and vast power over the rights and property of her subjects and her conquered enemies, the courts of that government are hedged in by rigid rules; not only bound by the sovereign will of the people, but they must obey every legislative command that does not clearly violate the established fundamental principles of the government. Courts then, instead of launching out upon a broad, philosophical and moral discretion as to natural justice and right between man and man, can only go to the wall thrown around them by political action. The discretion of courts is but an oath bound obedience to the declared will of the political departments or their governments; hence our principal labor is to ascertain what acts express the authoritative sovereign or legislative will of our State or general government, and it seems to us not difficult to determine whether or not our political departments of government recognize authoriiy in Arkansas to make laws, hold courts, etc., while in rebellion. The proclamations and commands of the President, the acts and resolutions of Congress, as well as the acts of the State herself, declare that, during the rebellion, she had no valid legal government ; that she was at war with the government, and in opposition to the national Constitution ; and upon the close of the rebellion the political departments of the State government not only refused to recognize the validity and binding force of the acts of the revolting State of Arkansas, but they expressly and in the most emphatic terms, and in a

38

solemn ordinance of the Convention, declared that: "The action of the Convention of the State of Arkansas, which assembled in the city of Little Rock, on the 4th day of March, A. D. 1861, *was and is null* and *void*, all the action of the State of Arkansas, under the authority of said Convention, of its *ordinances*, or its *Constitution*, *whether legislative*, executive, *judicial* or military, was and is hereby declared null and void," etc., etc. But we will not quote at greater length, or go into the history of this Convention, because our Chief Justice, in the case of *Penn v. Tollison*, decided at the present term, has treated this matter at considerable length.

We desire now to elaborate but the two propositions: *First,* that a State government, not in the Union of the United States, and in obedience to her Constitution, is not, as a law making power, a part of the United States government, and that there is no law, State or national, by which that government, when she conquers her opposers, is bound to recognize as valid the public or political action of any such State while engaged in rebellion against the national Constitution and laws. *Secondly,* That if the lawful government of the United States, or of a State, through the proper political departments, do not recognize the validity of the acts of such rebel State, the courts of the regular State government have no authority to hold the public acts and proceedings of a State, so in opposition to the Constitution and laws of the United States, valid and binding between individuals.

In the case of *Scott, et al. v. Jones, 5 Howard, 377–8*, which was upon a writ of error to the Supreme Court of the State of Michigan, to reverse a judgment of ejectment in that State court, it was alleged that the statute, under which one of the parties claimed, was enacted by a legislature convened before the State was admitted into the Union. The Supreme Court of the United States say: "Such conduct, by such bodies, if not situated within the territory of the Union, would be a foreign affair, and not within the cognizance of any of the departments of the government, unless so interfering with its

rights as to call for the political exercise of the executive or legislative authority over our foreign relations."

"Again, such conduct by bodies situated within our limits, unless by States·duly admitted into the Union, would have to be reached either by the power of the Union to put down insurrection or by the ordinary penal laws of the State or territories within which these bodies, unlawfully organized, are situated and acting. While in that condition their measures are not examinable at all by a writ of error to this court, as not being statutes by a State or member of the Union. It follows, then, that a statute passed by a political body,·before its admission into the Union, seems either not to be one under the cognizance of the Union, or its judicial tribunals, by means of *sec. 25*, of the *Judiciary Act*, unless re-enacted or adopted after becoming a State. The question of their competency is not, however, thus made a closed one, but may be discussed before the proper political tribunals."

In an earlier paragraph the court say : "Hence, two things must unite in order to justify it (the jurisdiction); there must be an act of solemnity and importance, such as a statute, and that statute must be by a State, a member of the Union and a, public body, owing obedience and conformity to its Constitution and laws." This latter clause clearly lays down the proposition that the courts of the United States will not recognize the statutes of any legislative body, unless that body is of a State *in the Union*, owing obedience and conformity to its Constitution and laws. They hold that a statute passed by a legislature, in a territory, cannot be considered as an act of the State, unless re-enacted or adopted after it becomes a State.

This distinguished and learned tribunal, in those earlier days, when the minds of the people had not been inflamed by the passions of war, say the question, as to the competency of such a legislature, is *not a closed one, but may be discussed before the proper political tribunals;* thus, beyond question, settling that whatever of law or rights may have existed, by reason of the action of a territory or State, not a member of the Union, *in*

*obedience* to *her Constitution*, is a matter to be addressed to and decided upon by the political, and not the judicial departments of the government; and whether that political determination was judicious, was wise, as it has appeared to be in most of the territories, or unwise, and influenced by passion, as has been alleged in some of the late rebel States, it is, nevertheless a settled proposition for the judiciary, and right or wrong, politic or impolitic, the credit or responsibility is upon that department to which the Supreme Court of the United States says it properly belongs.

It has been urged that the statutes, acts of courts, and other proceedings of rebel authorities, in this State, must be held valid because they were formal, and there was an actual existing government. Something more is necessary. Michigan had framed and adopted a constitution, her legislature had been duly elected and returned, her laws were in due form, and approved by her governor, acting under her constitution; there was no rebellion there, and no attempt or intention to do violence or wrong to any proper authority; but, under the United States Constitution, there had been no act of Congress recognizing their authority or enabling them to form a State government, and because of this mere oversight by her territorial authorities, the Supreme Court, in effect, say their acts must be held void. They would not even assume jurisdiction, because she had not political jurisdiction, in accordance with the Constitution.

What would the Supreme Court *then* have said of a State like Arkansas, acting in direct and palpable violation of the Constitution of the United States, and exerting every power in her command to destroy that Government? If possible, the answer is made more strikingly plain, when the political departments have declared that the action of this State, during the rebellion, shall be held null and void. If their language had been less explicit and definite, while the debates and proceedings of the Convention of 1868, and the individual views of its members, are so fresh in our minds, we could not doubt

as to what was their intention and purpose; and whether or not their action and policy was expedient and just, is not a question for the court to decide. They did intend, and by language unambiguous did enact that all action under the Constitution of 1861, or of the ordinances of that Convention, whether legislative, executive, judicial, or military, was and is null and declared void. This embraces the officers of the Arkansas circuit court. They were qualified under an ordinance of that Convention, and acting under that Constitution; their acts have not been recognized as valid, and by the Constitution of 1868 they were declared void; and, while we are sworn to support that Constitution, we cannot hold such acts valid and binding upon litigants who have in no way given assent thereto.

In conclusion, we repeat the propositions assumed: when a people engaged in war are subdued, by force of arms, their property rights must depend upon their terms of peace, or upon recognition of their laws or rights by the conquerors, and if such recognition is had, it must come from the political departments of the conquering State or Nation. If the political departments refuse to recognize as valid the former laws of the conquered people, the courts of the established government cannot hold them valid and binding. In the matter under consideration, the Confederates were engaged in war, with laws among themselves, but which laws were not acknowledged by any other power; they were subdued by force of arms, and surrendered to the United States without condition or reservation, and consequently took the risk of all the deprivations the war power, or triumphant government, might impose, and that government refused to recognize as valid any of their laws, or public acts, and the State, in her sovereign capacity, by a solemn ordinance declared that the acts of the departments of the State, during the rebellion, shall be held void, and the courts are bound by the ordinances of the Convention of 1868, and other proper acts of the political departments of the government.

Therefore, the pretended service of a summons, in this case, being under and by virtue of the authority, ordinances and laws of 1861, was invalid, and not binding upon the defendant below. The judgment is, therefore, reversed; and, as he has appeared to the action, by prosecuting this writ of error, the cause is remanded to the court below, with instructions to allow him to plead to the action therein, and to proceed to judgment.

HARRISON, J., being disqualified, did not sit in this case.

HON. JOHN WHYTOCK, Special Supreme Judge.