Johnson, J.
The facts disclosed present for our consideration important and novel questions growing out of the late civil war. They involve a determination of the legal *613 effect of the secession of the State of Arkansas, and the war that ensued, upon the power of the courts of that state, during the war,to render judgment against a citizen of Ohio, and also the extent to which faith and credit should be given to a judgment thus rendered, under the constitution and laws of the United States.
On behalf of the plaintiff', it is claimed that full faith and credit should be given to this judgment, under article 4, section 1 of the constitution of the United States, as a judicial proceeding of a state; but if it is not such, then at least it is entitled to all the verity of a foreign judgment, as the proceeding of a de facto court, having jurisdiction of the case and the parties.
The defendant insists that this is not the record of a court of a state of the Union; that while the act of secession was void, and the state was never legalty out of the Union, yet the government that was set up by the people of the state was a revolutionary usurpation in violation of the constitution; that this government was a government of force, maintained by arms ; that all its acts, legislative, executive, and judicial, were, as to the United States and its citizens, null and void.
It is further insisted that this was a war, in the sense of public law, and that the courts of Arkansas had no power to proceed to judgment against defendants; that they were by the war, and the duty which was imposed, as well as by the danger attending it, forbidden to appear and •defend.
It appears that this action was begun by the plaintiff in the Circuit Court of Crawford county in 1857.
Personal appearance was entered and issue joined prior to the war. After the state had joined the Southern Confedei’aoy, and while it was in arms against the Union, the case was tried. The attorney for defendants, who was retained and appeared before the war, continued to do so on the trial of the case, and consented to a trial. It is claimed these facts gave the court jurisdiction over the person, but the other side insists that such appearance could confer no power on *614 the court to do an unauthorized act, and that' the war worked a revocation of his agency. "
1. Article' IV, section 1, of the constitution'of the United States provides that,“ full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state ; and the congress may, by’geheral laws, prescribe the manner-in which such acts and proceedings shall be proved, and the effect thereof.” Under the power thus conferred, congress passed the act of May 26, 1790, which provided that “the records and judicial proceedings of the courts of any state shall be proved or admitted in any other court within the United States, by the attestation of the clerk and the seal of the court annexed, if there he a seal, together with the certificate of the judge, chief j ustice, or presiding magistrate, as -the case may be, that the attestation is in due form. And the said records and proceedings, authenticated as aforesaid, shall have such faith and credit given to them in every court within, the United States as they have’by law or usage in the courts of the state from whence said records are or shall be taken.”
Leaving out of view for the present the facts relied on as a defense in this case, let us inquire as to the scope and meaning of this constitutional provision and the act of Congress.
"What acts, records, and judicial proceedings are entitled to full faith and credit, and what is a judgment of a court of a state that imports absolute verity ?
By the act of 1790, a judgment which is valid in the state where rendered becomes, in the other states, a debt of record, hot re-éxaminable upon the merits, but it does not carry with it into another state the efficacy of a judgment against person or property that can be enforced by execution. To give it that force in another state, it must by/áction be made the judgment of such other state.
Hence it follows that such judgment is only evidence in another state that the subject-matter’ of the original suit has become a debt of record, which can not be avoided by *615 a plea of nul ticl record'. McElmoyle v. Cohen, 13 Pet. 330.
In an action on such judgment in'another state, whatever pleas would be good.in the state where rendered would be good in such other state. Hampton v. McConnell, 3 Wheat. 234.
The constitutional provision was not intended to confer a new power of jurisdiction on the courts of any state, but to prescribe the effect in other states of the acknowledged jurisdiction over persons and things within the state. Every judgment depends, for its force and validity, on the competency and authority of the tribunal which pronounces it, and may be assailed by showing a want or failure of jurisdiction over the subject-matter or the person, even though absolutely conclusive in other particulars.
The manifest design of the constitution was to give faith and effect to valid, judgments, and not to enable the courts of one state to exercise a usurped or illegal authority over the citizens of other states of the Union, who are not amenable to the jurisdiction of the tribunal.
Without the constitutional provision and the act of 1790, the judgments of one. state would stand in the tribunals of the others, on the same footing as foreign judgments, and only be respected on the principles of comity between nations, and not as a duty imposed by the paramount organic law. How far such judgments of a state of the Union, when duly authenticated, are entitled to faith and credit, and are conclusive, is a problem by no means free from difficulty. It has been productive of numerous decisions, not always harmonious.
One of the earliest cases was Bissell v. Briggs, 9 Mass. 462, where it was said : “ Whenever, therefore, a record of a judgment of any state is produced as conclusive evidence, the jurisdiction of the court is open to inquiry. And upon the same principle, if a court of any state should render a judgment against a man not within the state, nor bound by its law's, nor amenable to the jurisdiction of its courts; and if that judgment should be produced in any other state against the defendant, the jurisdiction of the court might *616 be inquired into, and if a want of jurisdiction appeared, no credit would be given the judgment.
“In order to entitle the judgment rendered to the full faith and credit mentioned in the federal constitution, the court must have jurisdiction, not only of the cause, but of the parties.” .
The same view was declared and enforced in Hall v. Williams, 6 Pick. 222.
In Rose v. Himely, 4 Cranch, 269, Chief-Justice Marshall says: “Upon principle, it would seem that the operation of every judgment must depend on the power of the court to render that judgment. ... In some cases, the jurisdiction depends as well on the state of things as on the constitution of the court.”
Eor a long time after the adoption of the constitution, it was supposed that its effect, in connection with the act of 1790, was to render the judgments of each state equivalent to domestic judgments in every other state; and this view was supported by the language of the Court in Mills v. Duryee, 7 Cranch, 484. It was so held in that case, and that a plea of nil debet was not a proper plea to an action on such judgment.
So far as the merits of that case are concerned, the doctrine there laid down is still adhered to; but as to the validity of a judgment dependent on the powrer of the court, quite a different view.is now entertained.
Mr.-Justice Story, who delivered that opinion, elsewhere says: “ But this does not prevent an inquiry into the jurisdiction of the court, in which the original judgment was given, to pronounce it; or the right of the state itself to exercise authority over the person or the subject-matter. The constitution did not mean to confer upon the states a new power or jurisdiction, but simply to regulate the acknowledged jurisdiction over persons and things within their territory.” (Story on Const., sec. 1313.) Again he says : “ It did not make the judgments of other states domestic judgments to all intents and purposes, but only gave a *617 general validity and credit to them as evidence.” (Story on Conflict of Laws, sec. 609.)
Chancellor Kent (1 Kent Com. 281, and vol. 2, p. 95, and note) says : “ It is only when the j urisdiction of the court in another state is not impeached, either as to the subject-matter or the person, that the record of the judgment is entitled to full faith and credit.”
This distinction is • strongly supported by D’Arcy v. Ketchum, 11 Howard S. C. 165, where the case of Mills v. Duryee was limited and explained.
It was there held that the constitutional provision and act of Congress giving full faith and credit to the judgments of each state, in every other state, do not refer to judgments rendered by a court having no jurisdiction of the parties — that it only referred to valid judgments.
It is an important feature of that ease, that by the law of the State of New York, where the judgment was rendered, it was valid. It was a judgment against two joint debtors, only one of whom was served. Under the state law, this was a valid judgment against both, and if the language of the act of 1790 had full force, this judgment, when properly authenticated, “ shall have such faith and credit given it in every court within the United States as it had by law or usage in the courts of the state from whence it was taken;” and yet when sued on in Louisiana, it was held void as to the party not served, though valid by New York law. It was said : “ The international law as it existed among the states in 1790, that a judgment rendered in one state, assuming to bind the person of a citizen of another, was void within the foreign state, when the defendant had not been served with process or voluntarily made defense, because neither the legislative jurisdiction nor that of the courts of justice had binding force. . . . In our opinion, Congress did not intend to overthrow the old rule.”
In Webster v. Reed, 11 Howard, 437, the defendant offered to defeat the force of a judgment by showing want of service, and it was held it could be done.
*618 In Starbuck v. Murray, 5 Wend. 148, it is said : “Unless a court has jurisdiction, it can never make a record which imports uncontrollable verity to the party over whom it has usui’ped jurisdiction, and he ought not therefore to be estopped by any allegation in the record from proving any fact that goes to establish the truth of the plea alleging want of jurisdiction. So long as the question is in issue, the judgment of a court of another state is, in effect, like a foreign judgment — it is prima facie evidence.”
From a careful review of numerous cases, we find the rule now well settled that neither the constitutional provision, that full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state, nor the act of Congress passed in pursuance thereof, prevents an inquiry into the jurisdiction of the court in which a judgment offered in evidence was rendered, and such a judgment may be contradicted as to the facts necessary to give the court jurisdiction, and if it be shown that such facts did not exist, the record will be a nullity, notwithstanding it may recite that they did exist, and this is true either as to the subject-matter or the person, or in proceedings in rcm as to the thing. Harris v. Hardiman et al., 14 Howard S. C. 334; Borden v. Filch, 15 John. 141; Christmas v. Russell, 5 Wallace, 290; Elliot v. Piersol et al., 1 Pet. 328; United States v. Arredondo, 6 Pet. 691; Vorhees v. Bank of U. S., 10 Pet. 475; Moulin v. Insurance Co., 4 Zab. 222; Mackay v. Gordon, 34 New Jersey, 286; Wilson v. Bank of Mt. Pleasant, 6 Leigh, 570; Story on Const., sec. 1307; Story on Confl. of Laws, sec. 609; Thompson v. Whitman, 18 Wallace, 457; Spencer v. Brockway, 1 Ohio, 261; Goodrich v. Jenkins, 6 Ohio, 44; Anderson v. Anderson, 8 Ohio, 108; Paine’s Lessees v. Mooreland, 15 Ohio, 445.
It follows, that while a judgment of a competent court of any state of the Union, that has jurisdiction or authority over the person and subject-matter, is conclusive upon the merits of the controversy in every state, yet the power *619 of the court to render it is an open question in an action like the present.
It is competent, therefore, in such action, to inquire into-the authority of the. pretended court to exercise judicial functions, whether this record comes from a,lawful tribunal, within a state of the union, .whether- that tribunal had.jurisdiction of the subject-matter, and whether it had by. any legal method obtained jurisdiction over the person, in order to determine whether it was a valid judgment under the constitution. Either of these inquiries does not affect the merits of the controversy in the original action.
II. Was this record a judicial proceeding- of a court of one of the states of the United States ?
The state has seceded and dissolved its connection with the United States. It declared independence, and joined the confederacy. These acts were null and void, but on this- foundation a new constitution with allegiance to the Confederate States was adopted, and for the time was maintained by armed rebellion. Civil war ensued. The existence of this new authority was being determined by wager of battle.
This usurping government was one unknown to the Constitution, and in direct antagonism to it and the authority of the federal laws and authority. It could acquire no-legal authority over the people of the United States, and no actual power beyond the range of its guns. When the-armed forces, raised to establish this new government and make good their declaration of secession and independence, surrendered, this unlawful state government fell. • The-present constitution and state government of Arkansas is not the successor of that, and derives none of its power from its prior existence. The Congress refused to reeogi nize it, or the validity of its acts. By the reconstruction acts, it was- declared there was no legal state government to represent the state in the Union, and Congress took steps to organize a government in conformity to the paramount laws of the Unión.
The courts of this usurped state government, set up on the- *620 ruins of the old, and dependent for its existence on organized treason, had no power over citizens of other states not domiciled there. It could acquire none by the steps taken. The defendants might cheerfully enter their appearance, and consent to have their case tried by a court of a state government, in harmony with the union, that recognized the binding force of the Constitution and laws of the United States, and where he was entitled to all the rights and immunities of a citizen of the United States, w'hile he would be . utterly unwilling to consent to be tried by a foreign court of a nation at war with, his government, and where his rights as American citizen are ignored.
These defendants never consented, to surrender their rights as citizens of the United States, guaranteed by its laws, and commit the issue to a court of new organization. The convention had no power to transfer this case from out the protection of federal laws, and make it amenable to the decision of a court unknown to them. What, then, was the status of the State of Arkansas, and the Circuit Court of Crawford county, under the new state organization, as a .state of the confederacy ?
In Texas v. White, 7 Wall. 700, Chief Justice Chase says:
“ Not only, therefore, can there be no loss of the separate and independent autonomy of the states, through their union under the constitution, but it may be not unreasonably said that the preservation of the states, and the maintenance of their governments, are as much within the design and care of the constitution as the preservation of the union and maintenance of the national government. The constitution, in all its provisions, looks to an indestructible union, composed of indestructible states. . . . Our conclusion, therefore, is that Texas continued to be a state, and a state of the Union, notwithstanding the transactions to which we have referred.”
In these remarks, the word state is used, not to mean the political organization or government. The Chief Justice says: 41 The people, in whatever territory, dwelling either temporarily or permanently, and whether organized under a reg *621 ular government, or united by looser and less definite relations, constitute tbe state. A state, in the ordinary sense-of tbe constitution, is a political community of free citizens, occupying a territory of defined boundaries, and organized under a government sanctioned and limited by a written constitution, and established by the consent of the governed. It is the union of such states, under a common constitution, which forms the distinct and greater political unit, which, that constitution designates as the United States, and makes of the people and states which compose it, one people- and one country.” Using the term “ state” in this sense, it was said by the court “ that Texas continued to be a state,, and a state of the Union.” After reciting the steps taken by the state to go out of the Union and join the confederacy, much the same as in case of Arkansas, it is added: “ When the war closed there was no government in the state, except that which had organized for the purpose of waging war on the United States. . . That government immediately disappeared. . . There being no government in constitutional relations with the union, it became the duty of the-United States to provide for the restoration of such a government.” Speaking of the acts of the rebel legislature of Texas, the court say: “ It can not be regarded in the courts of the United States as a lawful legislature, or its acts lawful.”'
It is added, however, that it was for some purposes a. government defacto, an actual government, which, though unlawful and revolutionary, possessed power over its own people, in such matters as did not affect the duty of the-state, or the people of the state, to the Union. The Chief Justice says:
“It is not necessary to attempt an exact definition within which the acts of such a state government must be treated as valid or invalid. It may be said, perhaps with suificient accuracy, that acts necessary to peace and good order among citizens — such, for example, as acts sanctioning and protecting marriage and the domestic relations, governing the course of descents, regulating the conveyance and transfer of property, real and personal, and pro *622 viding remedies for injuries of person and estate, and other .similar acts, which would be valid if emanating from a lawful government — must be regarded as valid when pro-needing from an actual, though unlawful', government; and that acts in furtherance and support of the rebellion against the United States, and intended to defeat the just rights of ■citizens, and other acts of like nature, must, in general, be regarded as invalid and void.”
Horn v. Lockhart, 17 How. 571, involved the power-of a Probate Court of Alabama, to make an order, during the war, based on an act of the legislature authorizing an executor to invest trust funds in confederate bonds. It is said, “ No legislation of Alabama, no acts of its convention, no judgment of its tribunals, and no decree of the confederate government can make such a transaction lawful.”
It is further said, “ That the acts of the several states, in their individual capacities, and of their different departments of the government, executive, judicial, and legislative, during the war, so far as they do not impair or tend to impair the supremacy of the national authority, or the Just rights of citizens under the constitution, are, in general, to be treated as valid.”
Huntington v. Texas, 13 Wall. 650, turned on the power of the government of Texas, during the rebellion, to pass title to certain bonds of the United States, owned by the .state. It is said, “ whether the alienation of the bonds by the usurped government, divests the title of the state, depends, as we have said, upon other circumstances than the ■quality of the government. If the government was in the actual control of the state, the validity of its alienation must depend on the purposes and object of it.”
The same point was before the Supreme Court in Taylor v. Thomas, 22 How. 479.
The rebel legislature of Mississippi, passed an act authorizing the issue of $5,000,000, in what was called “ cotton notes,” issued in form of currency, with which the state purchased cotton during the blockade. It is said, “ That *623 the legislature in question, subsequent to the adoption of the secession ordinance, and, of the ordinance by which the state acceded to and became a member of the insurrectionary confederacy, ceased to represent the state as a constitutional member of the federal union.”
These usurped state governments were not the states, and. while the states, in the legal and constitutional meaning of term, were still in the union, the political organization, the governments in armed rebellion, were insurrectionary and unlawful. It did not reDresent the states as members of the federal union.
In Thorington v. Smith, 8 Wall. 1, the character of the confederate government, formed by the seceding states, is considered, as it affected contracts of citizens, within its military lines. It is styled a government of “ paramount force,” whose existence is maintained against lawful authority by active military power. It is said, its existence was never acknowledged by the United States, even as a de facto civil government, but, while it existed, it was necessarily the duty of private citizens to acquiesce in its authority, and for such obedience the private citizen was not liable to his lawful government. On this ground, between citizens resident within its jurisdiction, a contract to pay in confederate notes, was valid.
In support of this view, is the case of United States v. Rice, 4 Wheat. 203, where it was held, that the inhabitants of the village of Oastine, in Maine, which was captured by the British in the war of 1812, and held until the treaty of peace, in 1815, passed under a temporary allegiance to the British government, which, as to them, suspended the operation of the laws of the United States.
So the military conquest and occupancy of Tampico and the state of Tamaulipas, during the Mexican war, by the army of the United States, did not make that territory a part of the United States, but as to other nations, while it was so occupied, it was deemed a part of the United States. Fleming v. Page, 9 How. 66.
In Livingston v. Jordan, Chase’s Decisions, 454, the Chief *624 Justice says : “ The courts of a state forming part of the Confederate States, had no jurisdiction, during the civil war, over parties residing in states which adhered to the national government.”
This case is important because of its similarity to the present.
A party acting as proohien ami for infants, owners of a plantation situate in that state, but who resided in Maryland, filed a petition, in 1861, in the Court of Equity of Sumpter county, South Carolina, where the land was situate, on a contract for the sale of the property by such party, and asking for confirmation. The sale was confirmed in March, 1861, and deed was made for the property to the purchaser.
Upon coming of age, and after the war, the infants repudiate the sale, and brought ejectment, and their right to recover turned on the validity of this decree, made on the application of their next friend. This was impeached on two grounds: 1st. That the contract of sale was made without authority to bind them. 2d. That the war suspended the power of the court to bind residents of Maryland.
Upon this last point, it is said : “ The jurisdiction of the state court over the plaintiff, whatever it was, terminated when the civil war broke out. Upon that point we entertain no doubt. As between parties residing in the State of South Carolina, and parties residing in the states which adhered to the national government, between whom war-made intercourse impossible, there could be no jurisdiction in the courts of South Carolina, while the war continued, by which the rights of non-residents could be injuriously affected.” While these remarks were not necessary to the decision of that case, they are nevertheless in point as the opinion of an eminent jurist.
Brooks et al. v. Feler et al., 85 Ind. 402, was a bill of review filed in Indiana after the war was over to review a decree made on an original suit commenced in 1861 by the plaintiffs’ attorney, in which a decree was rendered during *625 the war. The attorney had been employed just before the war by the plaintiff, who resided in Virginia, but who had no knowledge that the suit had been commenced or prose cuted to unsuccessful j udgment until after peace was restored. The court say a state of war existed between Virginia and Indiana, and that it was error of law to render judgment; that the court had no legal power to do so. We cite this case in support of the proposition before us, but without assenting to its application to the ease before the court of an adhering state. (See recent case in 66 111.)
In Mosely v. Tuthill, 45 Ala. 646, the validity of an order of the Probate Court of that state, made in 1868, to sell lands, while the state was under the control of the insurrectionary government, was considered.
The court say : “ Undoubtedly the court that made the-order for this sale was not a court of a state of the Union.” The same view was distinctly announced by JusticeWoodbury, in 1846, in the case of Scott v. Jones, 5 How. (S. C.) 378. Speaking of the unauthorized government, which had been erected in the territory of Michigan, before the admission of that state into the Union, he says r Such conduct by bodies situate within our limits, unless-by states duly admitted into the Union, would have to be reached either by the power of the Union to put down the-insurrection, or by the ordinary penal laws of the states or territories within which these bodies unlawfully organized are situated and acting; while in that condition their measures are not examinable at all by writ of error to this court,. as not being statutes of a state or member of the Union.”
In Illinois it has been held, that a citizen of that state-might maintain an attachment against a resident of Alabama during the war,.and, if no objection was interposed,, proceed to judgment and sale of the property, notwithstanding the war, and that proceedings to condemn land' might be had under the same circumstances. Mixer v. Sibley, 53 Ill. 61. While this proceeding would be regarded as binding in the state courts of Illinois, it would hardly *626 be recognized, in another state, if an action was brought on .such a judgment.
Ludlow v. Ramsey, 11 How. (S. C.) 581, was an attachment against a defendant, who had voluntarily left his residence in Tennessee, where the action was, and for the purpose of engaging in hostilities against the United States, and for that reason he could not “ be permitted to complain of legal proceedings regularly prosecuted against him as an absentee, on the ground of inability i;o return, or to hold communication with the place where the proceedings wez*e conducted.”
On the contrary, it was held, in Dean v. Nelson, where the defendant was ordered out of the city of Memphis by Union officers,.and while within the confederate lines proceedings in attachment were had against him. "Bradjey, J., says:
“ The defendants in the proceedings wei’e within the confederate lizzes.
“ Two of them had been expelled the Union lines, and not pez’mitted to return the other had never left the confedez’ate lines. A notice directed to them, and published in the newspapers, was an idle foz’m. They could not lawfully see or obey it. As to them the proceedings were wholly void.” Dean v. Nelson, 10 Wall. (S. C.) 158. See also Don v. Lipman, 5 Clarke & Fin. 1.
So in R. R. Co. v. Trimble, 10 Wall. 367, a decree in equity in one of the loyal states against a party, who, having been engaged in the rebellion, was a prisoner of war of the- United States outside of the state, and against whom there was no service, was held of no effect, and that a sale under it was void.
In Botts & Darnall v. Crenshaw, Chase 224, one of the questions was as to the validity, of an order of the Court of Hustings, of Virginia, a court of general equity jurisdiction, made •on the application of plaintiff’s attorney, during the war*, by which the attorney invested his client’s money in Confederate bonds. The plaintiffs were resident citizens of Kentucky. Judge Chase says : “ They being citizens of a state adhei’ing to the United States, residing there, this order cam *627 not be recognized by this court, because it is an act in derogation of the rights of persons beyond the jurisdiction of the de facto government of Virginia, of which the court Was a constituent part, and because it is an act the tendency and effect of which was to sustain the course-of the confederate government, and aid in its struggle against the United States.”
In the same case it was held that the ordinary relation of attorney and client was not dissolved by the war, and, therefore, that Crenshaw, who was employed before the war to collect a claim in Richmond, Virginia, continued to be plaintiff’s attorney during the war for the purpose of making the collection and holding the money, but that his application as such attorney to the court, by which he obtained this order to invest the funds after collection, conferred on the court no power to bind the client, who resided in Kentucky. That is our view of this case, ¿that while defendant’s attorney would have continued such, notwithstanding the war, for the purpose of protecting and saving his property and rights, yet he had no power to waive any of his client’s rights, as he did, by failing to plead a suspension of proceedings because of the war, much less could he consent that the ultimate rights of his client should be determined by a court which was a constituent part of a defacto government, that had no power over citizens of the United States beyond its military lines.
The regular course of justice was interrupted by revolt; the United States courts, post-offices, and other agencies of the general government were closed; its laws were ignored and defied. This new regime had a “ boundary marked by a line of bayonets, which could be crossed only by force.” Dy the public law of the civilized world, the judge, attorneys, officers of the court, and jury, were the enemies of defendants, acknowledging no allegiance t.o the constitution and laws of the Union.
All intercourse was forbidden; all remedies were suspended. “ The suspension of the remedy during the war is so absolute that courts of justice will not even grant a *628 commission to take testimony in an enemy’s country.” Hanger v. Abbott, 6 Wall. 532.
It was the duty of the attorney,either to have declined, to appear as defendant’s attorney, or, if he appeared, to have taken the proper steps to suspend the proceedings. His consent to a hearing at the time and under the circumstances was not in the interest of his clients, and clothed the court with no jurisdiction.
Again, by the state of civil war, these defendants became the public enemies of the State of Arkansas and its people, and they were our enemies.
The ordinary rules applicable to all public wars between independent nations would govern in determining the powers of the courts of that state over citizens of other states? conceding to that state authority to prosecute a war against the United States. .
Mattel says: “A civil war breaks the bands of society and government, or at least suspends their force and effect; it produces in the nation two independent parties, who consider each other as enemies, and acknowledge no common judge.”
In the Prize Cases, 2 Black (S. C.), 1, the court says:
“ The people of the rebel states were then to be deemed enemies of the people of the loyal states.
“ Several of these states have combined to form a new confederacy, claiming to be acknowledged by the world as a sovereign state. Their right to do so is now being decided by a wager of battle. The posts and territory of each of these states are held in hostility to the general government. It is no loose, unorganized insurrection, having no defined boundary or possession. It has a boundary marked by lines of bayonets, and which can be crossed only by force. South of this line is enemy’s territory, because it is claimed and held in possession by an organized, hostile, and belligerent power. All persons residing within this territory, whose property may be used to increase the revenues of the hostile power, are, in this contest, liable to be treated as enemies, though not foreigners. They have cast off their *629 allegiance, and made war on their government, and are none the less enemies because they are traitors.”
It must be borne in mind that we are not considering the validity of this judgment as if it were the act of a court of ■a state government of the Union, but as the act of' a court of an insurrectionary government, that by force has supplanted the lawful government of a state in the Union.
. Neither are we seeking to determine the effect of a judgment of a state court against an alien enemy, rendered during hostilities, in the courts of the same state where rendered.
An alien enemy, residing in a state at war with his own ■state, may be proceeded against, if no objection is interposed, to final judgment, and the courts of such state would ■treat it as a valid judgment. So perhaps it may, if, after service, he departs the realm before hostilities cease, and returns to his own state; but when that judgment of the foreign state is sought to be enforced by action in his own state, its courts, whose duty it is to protect its own citizens, will treat it as a nullity, because, by the laws of war, the courts of one belligerent have no power over the subjects of the other.
All judicial proceedings as between such enemies are suspended. “Silent leges inter arma.”
But it is said that by the act of 1790, such judgments, when properly authenticated, are to have the same force and effect in the state where sued on as by law or usage they have in the state where rendered; and Hawkins v. Filkins, 24 Ark. 286, and other cases cited in same volume, are cited as holding that the judgment of the Circuit Courts of that state during the war were valid.
Filkins v. Hawkins was between citizens resident there during '■the war. The defendant was served, and the parties, as we understand the case, were both present when judgment was rendered. This judgment might well stand on the principles we have laid down as the act of a defacto government over its own citizens within its jurisdiction.
*630 So far as the opinion is based on broader grounds, it ia overruled in Penn v. Tolleson, 26 Ark. 546, and Thompson v. Mankin, 26 Ark. 586, wherein it is held that “ the governments established by the states in rebellion were never recognized by the United States as legal state governments,” and that “ service made during the* rebellion by a confederate court is not binding on the party, to appear, and any decree or judgment thereon is a nullity.”
We have been referred to the cases of White v. Cannon, 6 Wall. 443, and Pepin v. Lachmeyer, 45 N. Y. 27, in support of the power of these state courts 'after secession to-render valid judgments.
In White v. Cannon the ordinance of secession of the state was passed January 26, 1861, and the judgment was-rendered January 31,1861, between parties before the court. It was suggested by counsel that the judgment was rendered-after the passage of the ordinances of secession, and therefore void.
To this, the court say: “ That ordinance was an absolute-nullity, and of itself, alone, neither affected the jurisdiction of that court nor its relation to the appellate power of this-court.” The mere passage of such ordinance did not abolish the court as a court of the lawful government.
Pepin v. Lackmeyer related to the validity of a judgment x’endered in a state eoui't of Louisiana, in New (Means, in> Februaxy, 1863, after the city had been under federal authority for nearly a year, between resident citizens. The militaxy commander had, on taking possession of the city, in May, 1862, issued a proclamation announcing “ that civil causes between party and party will be refex’red to the ordinary tribunals,” under which the state court -continued to-hear and determine causes. The president’s proclamation exempts from its provisions such parts of the insux’gent' states as became within the Union lines.
Blackwell v. Willard, 65 N. C. 555, is a late case bearing upon the validity of certain judicial proceedings, during the rebellion, in a suit pending prior to the war, wherein a. citizen of New York was complainant. Under an order *631 of court, a sale of real estate had been made in November, 1860, on deferred payments. The purchase-money was paid, after the war commenced, to the clerk and master of the court. The court, instead of suspending proceedings in the case, made an order at the Eall term, 1861, that the master had authority to receive payment of such deferred payments as the purchaser may desire to pay. It was held that “ the relations between the plaintiffs and their counsel were terminated by war, and the steps taken afterward-in the cause did not affect them. They had a good claim against the defendants before the war began; their remedy was suspended, and was revived on the return.of peace.” It was further said, the order of the court after war existed, and the payment to the clerk and master of the court are no bar to a recovery.”
It is said that the appearance of defendant’s attorney on the final trial gave the court jurisdiction ; that there was no revocation of his authority, and that the war did pot work such revocation.
Numerous cases may be cited to show that agencies in private affairs, relating to property of an alien enemy, within the agent’s country, so far as their acts are_ not in violation of the non-intercourse regulations, and are for the benefit of his principal, or protection of his property, are not revoked. We have been referred to none, however, showing that such agencies extend beyond the protection and care of his principal’s property and interests, to the creating new obligations. The attorney in this case might well have continued his employment, for the ’purpose of saving the rights of his clients; but it can hardly be claimed that it was within the scope of his employment to waive his clients’ right to have the action suspended, and, by his appearance, confer a power upon tffe court, which otherwise it did not possess, to bind them by a judgment, when war made it impossible for him to have a day in court. If, as we conclude, this court had no power over a citizen of an adhering state, pending the war, the consent of defend *632 ants’ attorney, under prior employment, could not confer such power.
The judgment of the Superior Court is affirmed.
Scott, Chief Judge, Day, and "Wright, JJ., concurred.