## WHITE *v.* CANNON.

1. A patent of the United States relinquishing to the patentee their right to certain land, but providing that it shall in no manner affect the rights of third persons, nor preclude a judicial decision between private claimants for the same land—this reservation being inserted in accordance with a statute which authorized the patent to issue,—allows a judicial inquiry into the merits of opposing claims to the land.

2. The ordinance of secession passed by the State of Louisiana, on the 26th of January, 1861, was a nullity, and did not affect the previous jurisdiction of the Supreme Court of that State, or its relation to the appellate power of the Supreme Court of the United States.

ERROR to the Supreme Court of Louisiana.

Cannon, holding an imperfect claim to a tract of land in that part of Louisiana which, in times when the sovereignty of the region was disputed between Spain and the United States, was called the "Neutral Territory," brought a petitory suit, under the civil law of Louisiana, against White, the possessor of a legal title under a patent of the United States.

The facts were these: By statutes of 1823 and 1824,* Congress provided for the examination of titles to lands in the district where this one lay. Persons having claims to lands situated in that district were authorized to present the evidence of their claims to the register and receiver of the local land office.

These officers were required to receive and record the evidence and to transmit to the Secretary of the Treasury, who then had charge of the land department of the government, a complete record of all the claims thus presented, with the evidence appertaining to each claim, and an abstract of the whole number of claims, dividing them into four classes; the *third* class consisting of claims founded upon *habitation, occupation or cultivation previous to the 22d of February,* 1819. The act of 1823 provided that nothing contained in it should be considered as a pledge by the United States to confirm any claim reported by the register and receiver.

---

* 3 Stat. at Large, 756; 4 Id. 65.

Under these acts, one Dyson, as assignee of *Edward* Mc-Laughlin, presented to the register and receiver of the land office a claim, by virtue of habitation, occupation, and cultivation, to a tract of land lying within the so-called "neutral territory," containing 640 acres, and proved by the testimony of two witnesses the habitation and cultivation of the tract by McLaughlin previous to February 22d, 1819. In their report to the Secretary of the Treasury, made on the 1st of November, 1824, the register and receiver recommended that this claim, together with many other claims, which were included in the third class, should be confirmed; and by the act of Congress of the 24th of March, 1828,* the claims thus recommended were confirmed, excepting a certain number, among which were the claims of Dyson, including the one above mentioned. These excepted claims, said the act, " are suspended until it is ascertained whether they are situated within the limits of the lands claimed by the Caddoe Indians." It was subsequently ascertained that the claim was not situated within the limits of the lands claimed by these Indians.†

Dyson, and parties claiming under him, were in continued and undisturbed possession of the premises for many years. The petitioner derived whatever estate he had through various mesne conveyances from him.

The title of the defendant arose in this wise: In February, 1835, Congress passed " an act for the final adjustment of claims to lands in the State of Louisiana,"‡ which authorized any persons having claims to land in that State, that had been recognized by previous laws as valid, but which had not been confirmed, to present them to the register and receiver of the local land office, within two years from the passage of the act, together with testimony in support of the same, and required those officers to record in a book kept for that purpose the notice of every claim thus preferred,

---

* 6 Stat. at Large, 382.

† Treaty between the United States and the Caddoe nation, dated July 1st, 1835, and promulgated February 2d, 1836; 7 Id. 470.

‡ 4 Id 749

together with the evidence in its support.　It also authorized them to receive evidence for other individuals who might resist the confirmation of a claim on their own behalf or that of the United States.　And it provided that those officers should, at or before the commencement of each session of Congress, make a report to the Secretary of the Treasury of the claims presented before them, together with the testimony, accompanied by their opinion of the validity of each claim, and that the report should be laid before Congress by the Secretary, together with the opinion of the commissioner of the general land office touching the validity of the respective claims.　Under this act, *John* McLaughlin, son of Edward McLaughlin, presented to the register and receiver a claim for the same tract of 640 acres which had been claimed by his father, and produced the testimony of two witnesses by which he proved the habitation and cultivation of the land by him previous to the 22d of February, 1819.　The testimony produced appeared to have been taken in 1834, for some reason not disclosed by the record, perhaps, as suggested by counsel, in anticipation of the passage of the act or some act of a similar kind.　In 1840, the register and receiver reported this claim and recommended its confirmation. The report was laid before Congress, and the claim was confirmed by the seventh section of the act of July 6th, 1842.* The act provided, however, that the confirmation should operate only as a relinquishment of the right of the United States, and should not affect the rights of third parties nor preclude a judicial decision between private claimants for the same land.

In September, 1844, a patent was issued to John McLaughlin pursuant to this act of confirmation, but with the same reservation as contained in the act itself.　In June, 1848, he transferred his interest to the defendant, who, two years before he purchased, knew that persons holding under Dyson— the presentation of whose claim as assignee of Edward McLaughlin was well known in the vicinity of the land— were in possession of it.

---

* 5 Stat. at Large, 491.

The petitioner prayed a judgment decreeing that he was the rightful and legal owner of the land, and that he recover the same with damages and mesne profits specified.

It was shown conclusively that John McLaughlin never occupied or cultivated the land claimed by him previous to February 22d, 1819, or at any other time, and that the testimony presented by him to the receiver and register was false. In May, 1843, before the patent issued, he made an affidavit, and placed it on record in the land office of the district, that he never had at any time previous to the 22d of February, 1819, resided upon the tract, but that it was within his knowledge that his father, Edward McLaughlin, had resided upon it and cultivated it on that day and for several years previous, and that his father had transferred his claim by sale to Leonard Dyson, who, as his assignee, made entry of the same. The residence upon and cultivation of the land claimed by the father was also abundantly established by other testimony.

The District Court of Louisiana gave judgment for the defendant. On appeal, the Supreme Court of that State reversed the judgment and decreed that the plaintiff be recognized as owner, and have possession, and have judgment for $3833$_{\frac{33}{100}}$, and that the defendant pay at the rate of $3 per acre on 480 acres from April 30th, 1859, and that the plaintiff elect, within thirty days after the judgment should become final, whether he would keep the improvements erected on the land on paying for the same $5250 to the defendant, and on his so electing or making default, execution to issue on this part of the judgment against the plaintiff; but on his refusal to retain the said improvements, the defendant to be permitted to remove the same within a reasonable time.

This judgment was rendered on the 31st of January, 1861. A convention of the State of Louisiana had passed an ordinance of secession, purporting to take the State from the Federal Union, on the 26th day of the same month.

This case was now here under the twenty-fifth section of the Judiciary Act.

*Hughes, Denver, and Peck, for plaintiffs in error,* contended that, upon the facts of the case, namely, that a patent had been issued to the plaintiff in error, White, and that the claim under which the defendant in error holds had never been confirmed by Congress, the judgment of the court below ought to have been in favor of the plaintiff in error. And they suggested for the consideration of this court, that the judgment of the Supreme Court of Louisiana, rendered after the passage of the ordinance of secession, was void.

*Mr. Louis Janin, contra.*

Mr. Justice FIELD, after stating the case, delivered the opinion of the court as follows:

Aside from the affidavit of John McLaughlin, which appears to have been made as if he were troubled with a consciousness of his guilt, the evidence establishes beyond question that he never cultivated any portion of the land claimed by him, and, as stated by the Supreme Court of the State of Louisiana in its opinion, never lived upon it otherwise than under the roof of his father; that Edward McLaughlin, his father, resided upon the land and cultivated it prior to February 22d, 1819, and had no neighbors within the distance of several miles; and that the register and receiver were grossly imposed upon by false and fraudulent testimony.

The defendant purchased with ample means of knowledge, and, we are of opinion, with full knowledge of all the circumstances; of the father's residence and cultivation, and of the son's false and fraudulent representations to secure the land to himself. He knew, two years before he purchased, that occupants of the land held as lessees under the vendor of the plaintiff. The presentation of a claim to the land by Dyson, as assignee of Edward McLaughlin, was a matter of general notoriety in the neighborhood. And the affidavit of John McLaughlin was on record in the land office of the district, where the defendant obtained his knowledge respecting the claim before making his purchase, and

where he was informed, according to his own statement as given by one of the witnesses, "that the claim being fraudulent made no difference, as the government had given a patent," and consequently if he "lost the land the government would be bound to remunerate him, which would be better for him than the land."

The case is therefore disembarrassed from all questions of the rights of third parties as purchasers of the legal title without notice of alleged outstanding equities. The act of July 6th, 1842, confirming the claim of John McLaughlin, provides that the confirmation "shall only operate as a relinquishment of the right of the United States, and shall not affect the rights of third parties, nor preclude a judicial decision between private claimants for the same land."

The patent which followed contained a reservation of similar import, and would, in fact, be subject to a similar reservation by force of the statute, even if it were not expressed.

The reservation allows a judicial inquiry into the merits of opposing claims to the land. Now there could be no opposing claims to land situated like the premises in suit, the legal title of which was in the United States, and with reference to which no promise of title had been made to others by the government, unless such claims arose from conflicting evidence respecting the residence and cultivation of different parties.

The purpose of all the legislation of Congress, with respect to titles in the "neutral territory," so-called, of Louisiana, was, among other things, to secure to parties the land which they had resided upon and cultivated during the period when the sovereignty of the country was disputed. It, in truth, invited the occupants to present the evidences of their habitation and cultivation; not indeed promising a title when such habitation and cultivation were established, but naturally exciting expectation that a title would follow, unless grave reasons of public policy intervened and prevented. In some instances there were conflicting claims to the same land, and this was known to Congress. The act of 1835 provided for taking and preserving the evidence offered by

parties resisting a confirmation, whether such contest was made on their account, or on behalf of the government.

We are, therefore, of opinion that it was for the benefit of parties thus situated—of claimants who might contest the fact of habitation, occupation, or cultivation—that the reservation was made. The United States, in effect, said: We part with the legal title by our patent, but we intend that it shall enure to the party who actually inhabited and cultivated the land previous to February 22d, 1819, and we allow this matter to be litigated before the judicial tribunals of the country, and to be determined by them.

Such being, in our judgment, the true intent and meaning of the reservation, the case presented can be readily disposed of. It becomes then the ordinary case of a party acquiring, by false and fraudulent means, a legal title to property to which another has the better right, and which he would have obtained, had the facts, as they existed, been truly represented. In such case equity will compel the holder of the legal title to transfer it to the party who was justly entitled thereto.

We admit that, independent of the reservation and of the construction which we have given to it, in the light of attending circumstances and the history of claims of this character, there would be no equitable title in the plaintiff, which could be the foundation of a suit. The act of 1823 did not confer any rights, for that expressly provided that nothing contained in it should be considered as a pledge on the part of the United States to confirm any claim reported by the register and receiver. The act of 1828 did not confirm any claim, or make its confirmation dependent upon any future contingency; it only suspended the action of Congress upon the claim until a particular fact could be ascertained. Nor can the position of the claimant, Edward McLaughlin, or of the plaintiff claiming under him, be assimilated to that of a person who has acquired a pre-emptive right to the land, or any other inchoate right, which entitles him, under the law, to be preferred by the government in the disposition of the legal title, and upon the equity of

which he can compel any person, subsequently acquiring that title, to hold it for his benefit. Congress could have bestowed the land in question upon any other party without giving ground for just complaint to Edward McLaughlin, or parties claiming under him. We place the entire right of the plaintiff to maintain the present suit upon the effect of the reservation in the act of July 6th, 1842.

The judgment of the Supreme Court of Louisiana adjudges and decrees that the plaintiff be recognized as the lawful owner of the land, and that a writ of possession issue. Treating this as substantially equivalent to a decree that the defendant convey the legal title acquired by the patent to the plaintiff, and surrender possession to him, we affirm the judgment. As to that portion of the judgment which awards damages to the plaintiff for the use of the premises, and compensation to the defendant for improvements, we are not called upon to express an opinion, as they are matters not brought under our supervision by the twenty-fifth section of the Judiciary Act. They are provisions made under the local laws of the State.

The objection that the judgment of the Supreme Court of Louisiana is to be treated as void, because rendered some days after the passage of the ordinance of secession of that State, is not tenable. That ordinance was an absolute nullity, and of itself alone, neither affected the jurisdiction of that court or its relation to the appellate power of this court.

JUDGMENT AFFIRMED.

Mr. Justice CLIFFORD dissented.

[See Walker v. Villavaso, *supra*, 124.