Mr. Justice CLIFFORD
 

 delivered the opinion of the court.
 

 Beyond all doubt the finding of the appellate court of the State of Mississippi is correct, and the court here also unanimously concur in the conclusion reached by that court, that the treasury notes authorized to be issued by the act under consideration, inasmuch as they were issued “against the public policy and in violation of the Constitution of the United States, are, therefore, illegal and void.”
 

 Three principal propositions áre submitted by the appellant to controvert that conclusion, which will be separately considered:
 

 (1.) Tliat the terms of the act authorizing the issue of the treasury notes do not warrant the conclusion reached by the State appellate court, that it was passed in aid of the rebellion.
 

 (2.) That the subsequent decisions of the same court have overruled the decisions of that court in that case.
 

 (3.) That certain decisions of this court are inconsistent with the conclusion that the act in question, when properly
 
 *487
 
 construed, affords any evidence that it was designed to accomplish any such purpose.
 

 I. Subsequent to the passage of the secession ordinance every branch of the State government — executive, legislative, and judicial — claimed that the State ceased by that act to be one of the States of the Federal Union, and denied in the most solemn forms of proceeding that the people of the State owed any further allegiance to the Federal Constitution or obedience to the laws of the United States. Instead of that the whole people of the State joined with one accord in adopting a new constitution differing widely from the Federal Constitution, and by which, as they claimed, they severed and dissolved all connection with the Federal Union and established a new confederation between the people of that State and the other seceding States.
 

 Such measures and pretensions led immediately to conflict of jurisdiction and presently to open hostilities, which showed that every prospect of
 
 compromise
 
 was at an end. Military preparations became necessary on both sides, and the several seceding States found it impossible to avoid increased and onerous taxation, and no one of the number felt the pressure in that regard more heavily than the State where these parties reside.
 

 Different expedients were adopted to replenish the empty treasury of the State, of which none perhaps afforded greater promise than the measure embodied in the act providing for the issue of treasury notes, as it had the effect to call forth the product of the great staple of the State from its secret depositories, and to render it available as the basis of an extended paper circulation. Legislative authority to issue such notes was accordingly granted, but the requirement was that the notes, when executed in the prescribed form, should be deposited in the treasury of the State, to be paid out by the auditor as advances to such of the people of the State as should comply with the before-mentioned terms and conditions prescribed in the act authorizing their issue.
 

 Other provisions of the act also afford very strong confirmatory proof that the act was passed in aid of the rebel
 
 *488
 
 lion, as, for example, the section which provides that whenever the then present blockade of the ports of the Confederate States should be removed (which was to be determined by the proclamation of the governor declaring the fact) the governor should in the same form require all persons to whom advanees.had been made, to deliver the cotton specified in their respective receipts within ninety days from the date of the proclamation. Nothing could be received by the governor in lieu of the cotton “ but gold and silver or the treasury notes issued under the act,” and the express requirement is that all the funds so received by the governor in payment of the advances shall be deposited with the treasurer, and be placed in the treasury of the State.
 

 Attempt is made in argument to show the inference drawn from those provisions, that the act was passed in aid of the rebellion, is repelled by another provision of the same act, which in effect provides that such treasury notes shall not be receivable in payment of the tax levied under a prior law and which is denominated a military tax, but it is a sufficient answer to that suggestion to say that by the terms of the act said notes are made receivable in payment of all taxes then due to the State or couuties except the military tax, and that when so received the notes might “ again be paid out by the treasurer
 
 upon any warrant of the auditor drawn upon the general
 
 treasuryNor is there anything in that exception inconsistent with the theory that the act was passed in aid of the rebellion, as it is highly probable that the legislature supposed that the other provisions of the act were sufficient to insure confidence in the paper emission without making the notes receivable in payment of the military tax.
 

 Suppose that is so, still it is insisted that the conclusion of the State court that the act was passed in aid of the rebellion cannot be supported, because the members of the legislature which passed the act were elected before the ordinance of secession was adopted; but two answers may be made to that proposition, either of which is sufficient to show that it is destitute of merit: (1.) That the act, if passed in aid of the rebellion, would be void even if passed by a
 
 *489
 
 legislature otherwise innocent of any treasonable act. (2.) That the legislature in question, subsequent to the adoption of the secession ordinance and of the ordinance by which the State acceded to and became a member of the insurrectionary confederacy, ceased to represent the State as a constitutional member of the Federal Union.
 

 Members of the legislature may perpetrate treasonable acts after the legislature is organized as well as before they take their seats, nor is the question affected in the least by the fact that the legislature was duly organized before the State seceded, as the public history of the period shows that the whole government and people of the State joined in the rebellion before the act in question was passed through the forms of legislation.
 

 II. Extended discussion of the second proposition submitted by the appellant will be unnecessary, as the cases referred to in support of the theory that the prior decision of that court upon the subject under consideration is overruled, do not afford the proposition any countenance whatever. They are as follows:
 
 Buchanan
 
 v.
 
 Smith
 

 *
 

 Mister
 
 v. McLean,
 
 †
 
 and
 
 Lawson
 
 v.
 
 Jeffries.
 

 ‡
 

 Neither of these cases support the proposition for which they are cited. On the contrary they decide, in substance and effect, that acts necessary to peace and good order among citizens — such, for example, as laws which sanction and protect marriage and domestic relations, govern the course of descents, regulate the conveyance and transfer of property, provide remedies for injuries to person and estate, and other similar acts which would be valid if emanating from a lawful government — must be regarded as valid when proceeding from an actual, though unlawful, government, but that acts in furtherance and support of rebellion and against the just rights of the citizens must be regarded as invalid, which accords with the rule of decision adopted and promulgated in the prior decision of the same court, and which is all that need be said responsive to that proposition.
 

 
 *490
 
 III. Under the circumstances it will not be necessary to add much to what has been remarked responsive to the preceding proposition to réfute the third one of the series, as the language of the final proposition decided by the State appellate court is borrowed from the decision in
 
 Texas
 
 v.
 
 White
 

 *
 

 of this court upon the same subject.
 

 Certain acts, such as those described by the State appellate court, it is admitted are valid, but the late Chief Justice, as the organ of the court, proceded to say that acts in furtherance or support of rebellion against the United States, or intended to defeat the just rights of the citizens, and other acts of .like nature, must be regarded as invalid and void. Nor is there anything in the case of
 
 White
 
 v. Hart
 
 †
 
 which is in the slightest degree inconsistent with the rule laid down in the preceding case.
 

 Exactly the same doctrines were laid down in the case of
 
 Huntington
 
 v.
 
 Texas,
 

 ‡
 

 in which the opinion of the court was also given by the late Chief Justice. Bonds for the payment of money to a large amount were issued, before the rebellion, by the United States to the State of Texas, to adjust certain claims made by that State growing out of a dispute as to her boundaries. Part of those bonds were still in the treasury of the State when the rebellion broke out. Texas joined the rebellion, and during that period some of those bonds were used by the ruling power of the State. War ensued, but in the progress of events the" rebellion was crushed. Various efforts were subsequently made to reorganize the State as one of the States of the Federal Union, and those efforts were so far successful before-the suit in the case last cited was commenced that the Supreme Court decided that the State was competent to sue. She brought that suit to recover part of those bonds. Defences of various kinds were set up by the defendant in the subordinate court. Exceptions were filed by him to the ruling of the court and the case was removed here by writ of error.
 

 In disposing of the case here the court remarked as fol
 
 *491
 
 lows: “ Whether the alienation of the bonds by the usurping government divests the title of the State depends, as we have said, upon other circumstances than the quality of the government. If the government was in the actual control of the State the validity of its alienation must depend on
 
 the object and purpose of it.
 
 If that was j ust in itself and laudable, the alienation was valid, but if the object and purpose were to’ break up the Uniou and to overthrow the constitutional government, the alienation was invalid.”
 

 Surely such remarks do not serve to support the proposition of the appellant; and he is equally unfortunate in his reference to the case of
 
 Horn
 
 v.
 
 Lockhart,
 

 *
 

 in which the opinion was given by Mr. Justice Field. “ Order,” say the court in that case, “ was to be preserved, police regulations maintained, crime prosecuted, property protected, contracts enforced, marriages celebrated, estates settled, and the transfer and descent of property regulated precisely as in times of peace. No one that we are aware of,” say the court, “ seriously questions the validity of judicial or legislative acts in the insurrectionary States touching these and kindred subjects
 
 where they were not hostile in their purpose or mode of enforcement to the authority of the national government, and did not impair the rights of citizens under the Constitution.”
 

 Viewed in the light of the qualifying phrase the remarks reproduced accord with the present views of the court, as the qualifying phrase is equivalent to an affirmative decision that judicial and legislative acts
 
 hostile in their purpose or mode of enforcement to
 
 the authority of the national government, or which impaired the rights of citizens under the Constitution, are invalid and void, which in principle is exactly what the State appellate court decided in this case.
 

 Decree affirmed.
 

 *
 

 43 Mississippi, 97.
 

 †
 

 lb. 268.
 

 ‡
 

 47 Id. 686.
 

 *
 

 7 Wallace, 733.
 

 †
 

 13 Id. 650.
 

 ‡
 

 16 Id. 413.
 

 *
 

 17 Wallace, 580.