Nott, Oh. J.,
delivered the opinion of the court:
This case is before the court on the simple jurisdictional question of loyalty. The proceedings have been of great length, there being in the record the depositions of nineteen witnesses for the claimant and of nine witnesses for the defendants, and.nine more or less voluminous written arguments. The decision of the court, however, goes no further than the determination of a single question of a legal character.
In the documentary evidence produced by the defendants are two bonds, given by the claimant to the State of Mississippi, which are in these terms:
“ State oe. Mississippi, Scott County :
“ Know all men by these presents, that we, D, J. Burnham, as principal, and Hi Eastland and John 0. Hardy, as sureties, are bound unto the State of Mississippi in the sum of five hundred dollars. There is a condition to the above obligation, which is this: The said D. J. Burnham has obtained from the State of Mississippi, as an advance on cotton, the sum of two hundred and fifty dollars in the treasury notes of said State. Now, if the said D. J. Burnham shall fail to pay the said advance in gold and silver, or in the said treasury notes, when required by the governor by proclamation so to do, and shall likewise fail to deliver the number of bales of cotton when so. *390 required in accordance with, bis receipt herein referred to, executed by the said D. J. Burnham, upou obtaining said advance, or if, upon its delivery, in accordance with said receipt, the proceeds thereof in gold and silver, or in the said treasury notes, shall not be appropriated by the persons to whom the said cotton is • delivered in discharge of said advance, or if upon a sale of said cotton by said persons, the net proceeds thereof in gold and silver, or in the said treasury notes, shall not be sufficient to discharge said advance, then this obligation is to be in force to the full amount of said advance, or such portion of it as may not otherwise have been discharged. Should the said advance be fully paid, then this obligation is to be void.
“ Witness our hands and seals this the 4th day of April, 1862.
“D. J. Burnham. SEAL.
“Hi Eastland. SEAL.'
“John 0. Hardy. 'SEAL.'

»

On the 19th December, 1861, the State of Mississippi as one of the Confederate States enacted a law which authorized “the issuance of treasury notes as advances upon cotton.” These treasury notes were receivable in payment of taxes “ now due, or that may hereafter become due, to the State, or to any county or municipal corporation, except the military tax.” The bond above set forth was a subscription under that statute.
On the part of the claimant it is contended that the object of the enactment was simply to supply the community with a circulating medium in the form of treasury notes, which were to be put in circulation by means of loans to individuals upon cotton. The scheme, it is said, was one.of a purely local character, and the provision that the notes should not be available for the payment of military taxes claimed by the Confederate government shows, so it is contended, that the scheme had no relation to the war.
There have been two other classes of cases before the court in which appeared transactions between claimants and the Confederate government.
The first of these involved what are generally known as “ the cottonloans.” In 1861 the Confederate government inaugurated a system of giving bonds in exchange for cotton. Individuals who desired to aid the cause, or who could not otherwise dispose of their cotton, entered into the agreements required by *391 tbe Confederate statutes. The following is one of the bonds so given:
“ [84 "bales; aggregate weight, 35,852, at llg = $4,212.61.]
“(Town oe Post-Oeeioe) Bogey Speings. “State oe Mississippi,

“County of Claiborne:

“The undersigned having sold to the Confederate States of America, and received the value of the same in bonds, the receipt whereof is hereby acknowledged, eighty-four bales of cotton, marked, numbered, and classed as in the margin, which is now deposited at gin and sheds on his plantation, hereby agrees to take due care of said cotton whilst on his plantation and to deliver the same at his own expense, at Grand Gulf, in the State of Miss., to the order of the secretary of the treasury, or his agents, or their assigns.
“Bio. Haeding.
“Bogey Speings, Ootr. 13,1862.
“ The undersigned, as agent of the Government, certifies that the within cotton has been examined by him or by a competent judge, and that its character will rank according to the commercial scale as good middling, and also that the weights and marks are as described — the cotton being in good merchantable order, and safely stored in a covered building.
“ The undersigned certifies that the price agreed upon is a fair market price at the present time.
“ B. G. Satling.”
Under the decisions of the Supreme Court in the cases of United States v. Padelford (9 Wall. R., 531) and Whitfield v. United States (92 U. S., 165) it has always been held by this court that such a sale was an act of aid and comfort to the rebellion. The Supreme Court in effect so said in the case last cited — “ he who sold his cotton to the Confederacy and took their bonds in payment, contributed directly to the means of prosecuting the rebellion,” and “ must be taken to intend the consequences of his own voluntary act.”
A third class of cases are those where a person funded his money under the Act 17th February, 1864 (Public Laws C. S., Vol. II, p.205). That act of the Confederate Congress provided “ that the holders of all treasury notes above the denomination of $5, not bearing interest, shall be allowed until the 1st day of April, 1864, east of the Mississippi Biver, and until the 1st day of July, 1864, west of the Mississippi Biver, to fund the *392 same.” For tbe treasury notes so funded tbe bolder received bonds payable twenty years after date, bearing interest at tbe rate of 4 per cent.
But tbis funding was in a measure obligatory. Tbe same statute imposed a tax of 33¿- per cent upon tbe notes not funded, a tax wbicb was “ to attach to said notes wherever circulated;” and after tbe first day of July, 1864, they were not “to be receivable in tbe payment of public dues;” and, in addition to tbe tax before stated, they were to “be subject to a tax of ten per cent per month.” In other words, if tbe bolder did not fund bis treasury notes, they would be in a short time wholly extinguished. As tbe bonds were receivable “in payment of all Government dues payable in tbe year 1864, except export and import duties,” and as most people bad taxes to pay, tbe court has regarded tbe statute as compulsory and has not deemed a funding according to its provisions a voluntary act on tbe part of a bolder of Confederate treasury notes. Moreover, if such a person bad refrained from funding and allowed bis notes to become extinguished by operation of tbe statute, it is clear that be would have aided tbe Confederate cause more than by receiving bonds in exchange.
Tbe element of compulsion did not enter into tbe transaction presented by tbe present case; and tbe question is whether tbe subscription to tbe Mississippi cotton loan was, like a subscription to tbe Confederate cotton loan, an act of aid and comfort to tbe then rebellion.
Tbis question has been determined by conclusive authority— tbe Supreme Court of Mississippi, affirmed by tbe Supreme Court of tbe United States. It came before that tribunal in 1869 in tbe case of Thomas v. Taylor (42 Miss. R., 651), a case wbicb was exhaustively argued and most ably decided. Tbe court held that tbe government of tbe State of Mississippi as one of the United States and tbe government of tbe State of Mississippi as one of tbe Confederate States were not identical; that the government wbicb was organized in the State after the passage of tbe ordinance of secession abolished the old government of tbe State; that tbe act of tbe State legislature after tbe ordinance of secession — this act 19th December, 1861— was to supply a circulating medium, and also to furnish tbe means by wbicb the empty treasury of tbe State might be replenished, and that tbe money so issued was in operation and *393 in effect in aid of the rebellion. The language of the court is as follows :
“ The act in question of the 19th of December, 1861, authorized the issuance of treasury notes to the amount of five millions of dollars. This act, by virtue of which the treasury note was issued that was tendered to the plaintiff in error by the defendant in error in payment of the tax due the State on his cotton, we believe, in its operation and effects, to have been in aicl of the late rebellion,- and therefore was not revived and continued in force by the ordinance of the convention of 1865. We regard it as a part of the financial system of the State at a time of great pecuniary want to supply not only a circulating medium for the people in the transactions of their ordinary business, but also to furnish the. means by which an empty treasury of the State might be replenished.
“The tenth section of the act provides4 that the said treasury notes shall be receivable in payment of all taxes now due or that may hereafter become due to this State, or to any county or school fund, or municipal corporation, except the military tax; ’ and that ‘ the said notes, when so received for taxes, may again be paid out by the treasurer upon any warrant of the auditor, drawn upon the general treasury.’ Hence, it will be seen that these notes were intended to supply an important part of the revenue by which the State government was to be sustained and enabled more effectually to aid the Confederate government in the prosecution of a sanguinary war, waged expressly for the purpose of subverting the Government of the United States. These treasury notes, being thus issued against the public policy, and in violation of the Constitution of the United States, are, therefore, illegal and void.” (Affirmed, 22 Wall., 479.)
The order of the court is, that the case be dismissed for want of jurisdiction and be so reported to Congress.