Nott, Ch. J.,
delivered the opinion of tbe court:
Tbe decedent in this case resided in Hardeman County, Tenn., during tbe civil war. Tbe claim having been referred by a committee of tbe House of Representatives, and being for stores and supplies, tbe question of tbe decedent’s loyalty is jurisdictional.
Tbe claimant has shown for his decedent a loyal record — that be did not give aid or comfort to tbe rebellion and loyally adhered to tbe United States. -The defendants, however, have produced a bond of a county collector of taxes in tbe State of Tennessee upon which tbe decedent was surety. The bond was given during tbe rebellion, and presents tbe legal question whether this act of tbe decedent was, at law, an act of aid or comfort to tbe rebellion.
Tbe Supreme Court decided in Padelford’s Case (9 Wallace R., 531) that going as surety upon the official bond of a com missary or quartermaster in the military service of the Confederate States from motives of personal friendship to the principal did constitute aid and comfort to the rebellion within the meaning of the abandoned or captured property act.
Tbe court, however, decided in tbe Home Insurance Company’s Case (22 Wallace R., 99) that an act passed by tbe legislature of Georgia during tbe rebellion to incorporate an insurance company, being ordinary legislation having no relation to anything else than tbe domestic concerns of the State, lawfully incorporated tbe company. The principle announced in that decision, and in many others there cited, is that tbe legislature of a seceded State was a legislature defacto and that *211 the acts of the State, “exculive, judicial, and legislative during the war, so far as they do not impair or tend to impair the supremacy of the national authority or the just rights of citizens under the Constitution, are in general to be treated as valid and binding.” It is also said that “the existence of a state of insurrection and war did not lessen the bonds of society or do away with civil government or the regular administration of the laws.”
But in the case of Taylor v. Thomas (22 Wallace, 479) it was held that the cotton loan of the State of Mississippi, 19th December, 1861, was an act in aid of the rebellion, notwithstanding that the bonds issued under the act were expressly excepted from being available in payment of military taxes. See also Burnham's Case (32 C. Cls. R., 388,) where the decision of the Supreme Court of the State of Mississippi in the same case and to the same effect is given.
It is insisted here, on behalf of the claimant, that the collection of taxes is necessary for the maintenance of civil order, and consequently that the case does not come within the decision in Padelford’s Case. The court is not unmindful of the wide difference between this case and Padelford’s, where the bond was given directly to support the military establishment of the Confederate government, and it appreciates the hardship of requiring an unlettered man, desirous of acting the part of a good citizen and of remaining loyal to the Government, to so direct and guard his conduct as to avoid acts the illegal character of which was known only to learned lawyers. The illegal character, moreover, of some of these acts was not dear, even to the legal profession, until they were so stamped by the highest judicial tribunal. The maxim ignorantia legis neminem excusat lays down a hard rule, which has caused injustice and suffering to innocent persons in many hard cases; but since the maxim was first enunciated no court has ever found a way to take a case out of its operation. The jurisdictional question here is a judicial question, and as such it must be determined by the rule of law applicable thereto, however hard the rule may be.
The principal point determined in the decision in Padelford is that, within the intent of these statutes — the Abandoned or captured property Act and the Bowman Act — a citizen may have done something in perfect good faith, with no wrongful motive, with no intent to aid the Confederate cause, and, in *212 deed, in the belief that he was not aiding it, and yet must be held by the courts to have been guilty of giving aid and comfort to the enemy. Mr. Padelford was undoubtedly a loyal man at heart; his conduct throughout the war had been most exemplary; he had given the bonds to keep a nephew and a friend out of the Confederate ranks, and he indeed believed that by so doing he was rendering the cause of the United States good service. Nevertheless the Supreme Court held the act to be illegal; an act, technically, of treason; an act which precluded him from the benefits of the remedial statute. This court must follow the principle there established unless a distinction can be drawn between the military officers’ bonds in that case and the collector’s bond in this.
The court can not draw that distinction. It is true that taxation is ordinarily necessary for the maintenance of civil government, and that the collector was a State officer and not an officer of the Confederate government. But during the war the military and civil branches of a seceded State’s government were inextricably blended. The States had ceased to be State governments of the United States, and the principal purpose for which they existed at the moment was to repel invasion and carry on the war. In an international case under our system of government there appears but one supreme authority, though its powers and responsibilities may be divided between the Federal and local governments. A foreign power can not demand redress from a State government, and the Secretary of State at Washington can not disavow the acts of State officials. The State governments and the Federal Gov ernment are all parts of one whole, and the foreign power knows only the whole. So in the case of the Confederate States during the civil war — the several States were parts of the one insurrectionary do facto government, and all existed .to overthrow, if possible, the authority of the United States. Without the support of the several States the Confederate congress at Bichmond would have fallen in a single month. The court, therefore, can make no distinction between a State officer and a Confederate officer during the period of the civil war. Each took an oath to support the constitution of the Confederate States; both acted officially to resist the authority of the United States. Taxes were imposed to carry on the civil government, but they were also imposed for resistance by military power to the sovereign authority of the United States. The *213 collector wbo served tire State of Tennessee in collecting taxes was also serving the Confederate cause by collecting that which has been termed the “ sinews of war.” Hardly had the State of Tennessee seceded when it passed an act — the third act under the seceded State government — “ To raise, organize, and eqxiip a provisional force, and for other purposes.” Act May (i, 18G1 (Public Acts Tennessee, extra session, April, 1861, p. 21). By the fourteenth section of that act the county courts were empowered to assess and collect a tax “to provide a fund for the relief and support of families of volunteers whilst in actual service, when, from affliction or indigenee, it may be necessary.” The collector for whom the decedent became surety was engaged, among other official duties, in the collection of that tax. It may be said that the purpose of the statute was a charitable one — to provide for the unfortunate. But its charities were circumscribed by war and its benefits limited to those who had volunteered to overthrow the authority of this Government. It was a part of a statute for a military establishment, and from a judicial point of view it was a provision to encourage enlistments.
The principle which seems to be established by the decisions of the Supreme Court is this: A loyal citizen of the United States, living in one of the insurrectionary States, might innocently accept some of the acts of a seceded State government— acts necessary to peace and good order; acts sanctioning and protecting marriage; acts governing the course of descents; acts regulating.the conveyance and transfer of property; acts providing remedies for injuries to person or estate (Texas v. White, 7 Wallace R., 700) — and, generally, he might yield an involuntary compliance under the stress of the overwhelming authority of a defacto government; for “the circumstances of the time made obedience to its authority, in civil and local matters, not only a necessity, but a duty;” “without such obedience civil order was impossible” (Thorington v. Smith, 8 Wallace R., 1, 10); but he could do nothing to aid the government of a seceded State. To assist it, to take part in carrying it on, to accept office under it, to do anything more than to yield passive submission to its illegal acts, was, under the authorities, giving aid and comfort to the rebellion.
The defendants’ motion for a new trial is allowed, and the case will be reported to Congress as dismissed for want of jurisdiction, because the claimant gave aid and comfort to the rebellion.