**Scott KOHLHAAS, Appellant,**

v.

**STATE of Alaska, OFFICE OF the LIEUTENANT GOVERNOR, Appellee.**

No. S–11866.

Supreme Court of Alaska.

Nov. 17, 2006.

---

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Scott Kohlhaas drafted an initiative calling for Alaska's secession from the United States or, in the alternative, directing the state to work to make secession legal, and submitted the initiative, along with one hundred signatures, to the lieutenant governor. Upon receiving the attorney general's advice that the initiative was improper, the lieutenant governor declined to certify the initiative for circulation. Kohlhaas appealed to the superior court, which affirmed the lieutenant governor's actions. Because the initiative seeks a clearly unconstitutional end, the lieutenant governor correctly declined to certify it. We therefore affirm the judgment of the superior court.

## II. FACTS AND PROCEEDINGS

Kohlhaas sued the state and the lieutenant governor for refusing to certify a ballot initiative calling for the State of Alaska's secession from the United States. Kohlhaas submitted the initiative to the Office of the Lieutenant Governor in April 2003, accompanied by at least one hundred qualifying signatures as required by Alaska law. The text of the initiative follows:

INITIATIVE PETITION:

AN INITIATIVE REQUIRING THE STATE OF ALASKA TO VOTE ON OBTAINING ALASKAN INDEPENDENCE, IF LEGALLY POSSIBLE, OR TO SEEK CHANGES IN EXISTING LAW AND CONSTITUTIONAL PROVISIONS TO AUTHORIZE, AND THEN OBTAIN, INDEPENDENCE.

Be it enacted by the people of the State of Alaska:

(1) At the next regular general election, the following question shall be presented to the voters of the State of Alaska for approval or rejection:

Kenneth P. Jacobus, Anchorage, for Appellant.

Sarah J. Felix, Assistant Attorney General, and David W. Márquez, Attorney General, Juneau, for Appellee.

"Shall the State of Alaska obtain independence from the United States of America, and become an independent nation, if such independence is legally possible, and if such independence is not legally possible under present law, shall the State of Alaska seek changes in existing law and Constitutional provisions to authorize such independence, and then obtain independence?"

(2) If this question is not answered affirmatively, then this question shall be placed before the voters of Alaska every ten years in the future.

(3) The provisions of this Act are independent and severable, and if any provision of this Act, or the applicability of any provision to any person or circumstance, shall be held to be invalid by a court of competent jurisdiction, the remainder of this Act shall not be affected and shall be given effect to the fullest extent practicable.

The Department of Law reviewed the petition application for compliance with AS 15.45.030 [1] and AS 15.45.040.[2] It advised the lieutenant governor that the initiative does not comply with the constitutional and statutory provisions governing the use of the initiative. In its recommendation to the lieutenant governor, the Department of Law indicated that Kohlhaas's initiative, known as 03INDP, fails because "[t]he initiative may not be used to propose amendments to the Alaska State Constitution" and "the law is clear that a state may not secede from the union." Based on this recommendation, Lieutenant Governor Loren Leman declined to certify the initiative petition for circulation.[3]

Kohlhaas appealed to the superior court. The state moved for summary judgment. In his cross-motion and opposition to the state's motion for summary judgment, Kohlhaas argued that the lieutenant governor must certify the initiative for circulation, since initiatives that are not clearly unconstitutional may be judicially reviewed only after enactment. Superior Court Judge Sen Tan granted the state's motion and denied Kohlhaas's, ruling that secession is clearly illegal. The superior court denied Kohlhaas's motion for reconsideration. Kohlhaas appeals.

## III. STANDARD OF REVIEW

We review a grant of summary judgment *de novo*.[4] When the superior court acts as an intermediate court of appeals, we independently review the decision of the ad-

---

1. AS 15.45.030 provides:
   The application must include the
   (1) proposed bill;
   (2) printed name, the signature, the address, and a numerical identifier of not fewer than 100 qualified voters who will serve as sponsors; each signature page must include a statement that the sponsors are qualified voters who signed the application with the proposed bill attached; and
   (3) designation of an initiative committee consisting of three of the sponsors who subscribed to the application and represent all sponsors and subscribers in matters relating to the initiative; the designation must include the name, mailing address, and signature of each committee member.

2. AS 15.45.040 provides:
   The proposed bill shall be in the following form:
   (1) the bill shall be confined to one subject;
   (2) the subject of the bill shall be expressed in the title;
   (3) the enacting clause of the bill shall be: "Be it enacted by the People of the State of Alaska;"
   (4) the bill may not include subjects restricted by AS 15.45.010.
   AS 15.45.010 provides:
   The law-making powers assigned to the legislature may be exercised by the people through the initiative. However, an initiative may not be proposed to dedicate revenue, to make or repeal appropriations, to create courts, to define the jurisdiction of courts or prescribe their rules, or to enact local or special legislation.

3. Former AS 15.45.070 provides: "The lieutenant governor shall review the [initiative] application and shall either certify it or notify the initiative committee of the grounds for denial." This statute was amended in 2006 to include a sixty-day deadline. Ch. 38 § 2, SLA 2006. AS 15.45.080 provides: "The lieutenant governor shall deny certification upon determining in writing that (1) the proposed bill to be initiated is not in the required form; (2) the application is not substantially in the required form; or (3) there is an insufficient number of qualified sponsors."

4. *Alaska Action Ctr., Inc. v. Municipality of Anchorage*, 84 P.3d 989, 991 (Alaska 2004).

ministrative agency or actor.[5] The resolution of this case requires statutory and constitutional interpretation, to which we apply our independent judgment, adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[6] Additionally, although we liberally construe constitutional and statutory provisions that apply to the initiative process, we also have a duty to carefully consider the initiative's subject matter, given the constitutional limits on the people's right of direct legislation.[7]

## IV. DISCUSSION

### A. The State May Refuse To Certify an Initiative That Proposes Clearly Unconstitutional Ends.

■ Article XI, section 1 of the Alaska Constitution guarantees the right to enact legislation by initiative: "The people may propose and enact laws by the initiative, and approve or reject acts of the legislature by the referendum." This right does not extend to certain subjects. Under article XI, section 7, "The initiative shall not be used to dedicate revenues, make or repeal appropriations, create courts, define the jurisdiction of courts or prescribe their rules, or enact local or special legislation." A further limitation on subject matter is found in article XII, section 11: "*Unless clearly inapplicable,* the law-making powers assigned to the legislature may be exercised by the people through the initiative, subject to the limitations of Article XI." [8] The phrase "unless clearly inapplicable" was included in the Alaska Constitution "so that the initiative would not replace the legislature where the legislature's power serves as a check on other branches of government, such as legislative power to define courts' jurisdiction or override judicial rules." [9] Finally, article XII, section 11 also indicates that the power of the people to enact laws extends no further than the power the legislature would have to enact a similar law.[10] These constitutional provisions are codified in the Alaska Statutes.[11]

■ As a general rule, we refrain from giving pre-enactment opinions on the constitutionality of statutes, whether proposed by the legislature or by the people through their initiative power, since an opinion on a law not yet enacted is necessarily advisory.[12] However, we have enunciated two grounds on which a petition may be rejected before circulation, from which rejection the sponsors may obtain judicial review.[13] First, a petition may be rejected if it violates the subject matter restrictions that arise from the constitutional and statutory provisions governing initiatives, such as article XI, section 7's prohibition on appropriation through initiative.[14]

■ Second, a petition may be rejected if it "proposes a substantive ordinance where controlling authority establishes its unconstitutionality." [15] This is an exception to the rule that judicial review of an initiative's constitutionality may not be obtained until

5. *Circle De Lumber Co. v. Humphrey,* 130 P.3d 941, 946 (Alaska 2006).

6. *Alaska Action Ctr.,* 84 P.3d at 991.

7. *Brooks v. Wright,* 971 P.2d 1025, 1027 (Alaska 1999).

8. (Emphasis added.) To test whether the initiative is "clearly inapplicable," one must ask whether "even 55 idiots would agree that it was inapplicable." *Brooks,* 971 P.2d at 1028 (quoting 4 PROCEEDINGS OF THE ALASKA CONSTITUTIONAL CONVENTION 2849 (January 21, 1956)).

9. *Brooks,* 971 P.2d at 1029. *See also State v. Trust the People,* 113 P.3d 613, 627–28 (Alaska 2005).

10. *See Whitson v. Anchorage,* 608 P.2d 759, 761 (Alaska 1980); *Municipality of Anchorage v. Frohne,* 568 P.2d 3, 8 (Alaska 1977) (making

same observation with regard to law-making capacity of municipality and its residents).

11. *See* AS 15.45.010 & AS 15.45.040.

12. *Boucher v. Engstrom,* 528 P.2d 456 (Alaska 1974), *overruled on other grounds by McAlpine v. Univ. of Alaska,* 762 P.2d 81, 84 (Alaska 1988).

13. *State v. Trust the People,* 113 P.3d at 624, 625 n. 50.

14. *See Staudenmaier v. Municipality of Anchorage,* 139 P.3d 1259 (Alaska 2006) (pre-election review appropriate where initiative would effect appropriation in violation of section 7); *Alaska Action Ctr., Inc. v. Municipality of Anchorage,* 84 P.3d 989, 992 (Alaska 2004) (same).

15. *Kodiak Island Borough v. Mahoney,* 71 P.3d 896, 900 (Alaska 2003).

after the voters have enacted the initiative. If the initiative's sponsors bore the burden of demonstrating every initiative's constitutionality, the voters' law-making powers would be overly constricted. In setting forth this rule in *Kodiak Island Borough v. Mahoney,* we found persuasive the following observation by Superior Court Judge Morgan Christen:

> It is not the Clerk's duty to reject every petition that may raise a constitutional issue, unless the Alaska Supreme Court has already decided the constitutional issue in a manner favorable to the proposed initiative. To do so would effectively be a decision by the Clerk that a proposal is unconstitutional merely because no authority exists expressly declaring it constitutional. If this were permitted, every initiative raising an issue of first impression would be defeated before reaching the voters.[16]

In *Mahoney* we provided an example of a clearly unconstitutional initiative: "[A] clerk should reject an initiative that is properly submitted procedurally but that proposes an ordinance mandating local school segregation based on race."[17] We indicated that a clerk's power to declare an initiative unconstitutional is analogous to the power of an executive agency to declare a statute unconstitutional. This includes the authority to "abrogate a statute which is clearly unconstitutional under a United States Supreme Court decision dealing with a similar law."[18]

## B. Secession Is Clearly Unconstitutional.

■ Kohlhaas argues that the appropriate time to review the constitutionality of 03INDP is after its enactment rather than before its certification, since there is no controlling authority clearly establishing its unconstitutionality. The crux of his argument is that neither the Alaska Constitution nor the United States Constitution contains provisions expressly prohibiting secession. The state argues that 03INDP is clearly unconstitutional under Supreme Court decisions addressing secession. We agree with the state that secession is clearly unconstitutional.

Shortly after the Civil War, the Supreme Court considered whether the Confederate Texas legislature had the power to pass legislation resulting in the sale of bonds that the federal government had issued to Texas on its admission to the Union in 1845. The bonds in *Texas v. White,*[19] issued by the United States before the Civil War, were not payable without the Texas governor's signature. During the war, the Confederate Texas legislature repealed the signature requirement and sold the bonds. After the war, the Supreme Court held that the sales were invalid since the Confederate legislation was void, having been enacted for the unlawful purpose of funding treason.[20] The nullity of the Confederate legislation is essential to the holding.[21]

Kohlhaas maintains that *Texas v. White* contains "highly suspect" reasoning because it fails to discuss the Ninth and Tenth Amendments. He argues that because the Constitution is otherwise silent on secession, secession is one of the rights reserved by those amendments. The decision quotes the Tenth Amendment almost exactly and discusses at great length the rights of the states and the people within the Union:

> Under the Constitution, though the powers of the States were much restricted, still, all powers not delegated to the United States, nor prohibited to the States, are reserved to the States respectively, or to the people. ... [T]he people of each State compose a State, having its own government, and endowed with all the functions essential to separate and independent existence[;] ...

*Morgan* limited the application of *Texas v. White* to cases where the purchaser could be charged with notice of the defective title.

---

16.  *Id.* at 899.

17.  *Id.* at 900 n. 22, *referring to Brown v. Bd. of Educ. of Topeka, Kan.,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

18.  *Mahoney,* 71 P.3d at 900.

19.  74 U.S. (7 Wall.) 700, 19 L.Ed. 227 (1868), *overruled in part by Morgan v. U.S.,* 113 U.S. 476, 20 Ct.Cl. 533, 5 S.Ct. 588, 28 L.Ed. 1044 (1885).

20.  *Id.* at 733–34.

21.  *Id.*

without the States in union, there could be no such political body as the United States. Not only, therefore, can there be no loss of separate and independent autonomy to the States, through their union under the Constitution, but it may be not unreasonably said that the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government. The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States. When, therefore, Texas became one of the United States, she entered into an indissoluble relation. All the obligations of perpetual union, and all the guaranties of republican government in the Union, attached at once to the State. The act which consummated her admission into the Union was something more than a compact; it was the incorporation of a new member into the political body. And it was final. The union between Texas and the other States was as complete, as perpetual, and as indissoluble as the union between the original States. There was no place for reconsideration, or revocation, except through revolution, or through consent of the States.[22]

Furthermore, the Supreme Court has interpreted the Tenth Amendment in a manner contrary to the interpretation Kohlhaas urges. In considering whether states could impose term limits on their federal legislators, the Court held that the Amendment

"could only 'reserve' that which existed before."[23] Thus " 'The states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government.... No state can say, that it has reserved, what it never possessed.' "[24] Like representation in Congress, secession from the Union springs from joinder to the Union. No state possessed a right to secede before admission, and so no state would retain such a right under the Tenth Amendment.

Kohlhaas also suggests that *Texas v. White* should not be taken as black letter law since the decision is tainted by the "context, emotions, and political situation" immediately following the Civil War, and has not been cited except as dicta by modern cases. This argument not only trivializes the impact of the Civil War on the Nation but also ignores a plenitude of Supreme Court cases holding as completely null the purported acts of secession by other Confederate states.[25] Unsurprisingly, the Supreme Court has had little occasion since Reconstruction to address the legality of secession. In 2004 the Supreme Court observed that inclusion of the word "indivisible" in the Pledge of Allegiance was significant because "the question whether a State could secede from the Union had been intensely debated and was unresolved prior to the Civil War."[26]

Even though secession is not explicitly addressed in the United States or Alaska Constitutions, it is clearly unconstitutional since opinions of the Supreme Court interpreting the federal constitution—including *Texas v.*

---

22. *Id.* at 725. Although *Texas v. White* does not refer to the Ninth Amendment, the case for secession under that amendment is even weaker than any argument under the Tenth Amendment, as the Ninth Amendment preserves individual rights rather than state powers. U.S. CONST. amend. IX.

23. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 802, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995).

24. *Id.* at 802, 115 S.Ct. 1842 (quoting 1 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 627 (3d ed. 1858)).

25. *See, e.g., White v. Cannon*, 73 U.S. (6 Wall.) 443, 450, 18 L.Ed. 923 (1867) (Louisiana ordinance of secession "was an absolute nullity");

*Taylor v. Thomas*, 89 U.S. (22 Wall.) 479, 491, 22 L.Ed. 789 (1874) (issuance of treasury notes following Mississippi's ordinance of secession void); *White v. Hart*, 80 U.S. (13 Wall.) 646, 651, 20 L.Ed. 685 (1871) (Georgia never out of pale of Union); *Daniels v. Tearney*, 102 U.S. 415, 418, 26 L.Ed. 187 (1880) ("That the ordinance of secession was void is a proposition we need not discuss. The affirmative has been settled by the arbitrament of arms and the repeated adjudications of this court.").

26. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 6 n. 1, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004).

*White*—constitute controlling authority.[27] Kohlhaas's attempt to discount the force of *Texas v. White* is wholly misplaced. In 1960 Justice Frankfurter characterized that decision thus:

> The readjustment of the relationship between the States that had remained in the Union and those that had seceded presented major issues not only for the political branches of the Government, the President and the Congress, but also for this Court. Insofar as the perplexing and recalcitrant problems of Reconstruction involved legal solutions, the evolution of constitutional doctrine was an indispensable element in the process of healing the wounds of the sanguinary conflict. It was in aid of that process that this Court formulated the doctrine expressed in the famous sentence in *State of Texas v. White:* "The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States." [28]

When the forty-nine-star flag was first raised at Juneau, we Alaskans committed ourselves to that indestructible Union, for good or ill, in perpetuity. To suggest otherwise would "disparage the republican character of the National Government." [29]

### C. Because the Initiative Has Not Been Circulated, We Decline To Consider Whether the Unconstitutional Portions May Be Severed.

Kohlhaas argues that—even if, as we reaffirm today, secession is unconstitutional—the second section of the initiative, which directs the state to pursue the enablement of secession, is salvageable. He urges us to apply our decision in *McAlpine v. University of Alaska* and thereby sever the unconstitutional portions of the initiative from the al-

legedly constitutional portions.[30] But *McAlpine's* severance test is particularly aimed at situations where "the requisite number of voters have already subscribed to an initiative," [31] that is, after the initiative has been certified but before the election. Since the initiative here has not been subscribed to by a substantial portion of the populace, the burden on the initiative's sponsors to redraft and resubmit the initiative is not too onerous.

## V. CONCLUSION

Secession is clearly unconstitutional and therefore an improper subject for the initiative. Accordingly, the lieutenant governor correctly declined to certify the petition, and the superior court correctly affirmed his decision. We therefore AFFIRM the judgment of the superior court.

---

**27.** The Supremacy Clause provides: "This Constitution, and the laws of the United States which shall be made in pursuance thereof ... shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding." U.S. Const. art. VI, cl. 2. *See also Dickerson v. United States,* 530 U.S. 428, 437, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (constitutional decisions of Supreme Court may only be superseded by constitutional amendment).

**28.** *United States v. Louisiana,* 363 U.S. 121, 131–32, 80 S.Ct. 961, 4 L.Ed.2d 1096 (1960) (Frankfurter, J., concurring).

**29.** *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 838, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (Kennedy, J., concurring).

**30.** *McAlpine v. Univ. of Alaska,* 762 P.2d 81 (Alaska 1988).

**31.** *Id.* at 94.